# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

DAVID R. DYSON,                )
     Plaintiff,              )
                            )
     v.                   )     CAUSE NO.: 2:14-CV-389-PRC
                            )
MEGAN J. BRENNAN, Postmaster General,   )
     Defendant.            )

## OPINION AND ORDER

This matter is before the Court on (1) Defendant's Motion for Summary Judgment [DE 98], filed by Defendant Megan J. Brennan, Postmaster General, on September 15, 2016; (2) Defendant's Motion to Strike [DE 114], filed on January 10, 2017; and (3) Plaintiff's Motion Requesting Leave to File Sur Reply to Defendant's Reply [DE 119], filed by pro se Plaintiff David R. Dyson on January 23, 2017. All motions were fully briefed as of February 16, 2017.

In his Verified Third Amended Complaint, filed April 4, 2016, Plaintiff David R. Dyson brings claims under Title VII for race discrimination (Count I), sex discrimination (Count II), harassment and hostile work environment (Count III), and retaliation (Count IV). The "Statement of Facts" section of the Third Amended Complaint begins with the subtitle "Declaration of David R. Dyson Pursuant to 28 U.S.C. Section 1746," which in turn begins with the statement, "I, David R. Dyson, declare if called upon could competently testify to the following facts from my own personal knowledge." (ECF 68, p. 4, ¶ 6). The section concludes with the statement, "I, Self-Represented Plaintiff, David R. Dyson, declare under penalty of perjury under the Laws of the

United States of America that the statements presented in this affidavit are true and correct." (ECF 68, p. 4, ¶ 60). This statement is followed by Plaintiff's signature and the date of April 4, 2016.[1]

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure require that a motion for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment is appropriate when no material fact is disputed and the moving parties are entitled to judgment as a matter of law, meaning that no reasonable [juror] could

---

[1] In his "Response Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment," Plaintiff includes sections titled "Factual Background" and "Facts," both of which cite Plaintiff's April 4, 2016 Declaration made in compliance with 28 U.S.C. § 1746, which was included in his Third Amended Complaint. *See* (ECF 113, pp. 2, 4 (citing ECF 68, ¶¶ 6-61)). In addition, although not referenced in either the "Factual Background" or the "Facts" sections, Plaintiff has also submitted a "Plaintiff's Statement of Additional Facts" supported by a December 19, 2016 Declaration. *See* (ECF 112); (ECF 112, Ex. A). As noted by Defendant, Plaintiff has not complied with Northern District of Indiana Local Rule 56-1(b)(2), which requires a party opposing summary judgment to "include a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary." *See* N.D. Ind. L.R. 56-1(b)(2); *see also* (ECF 116, p. 2). Plaintiff has nevertheless submitted evidence in support of his Response in Opposition that the Court will consider in the interest of justice in light of his pro se status. *See* Fed. R. Civ. P. 56(c)(3). In addition, Plaintiff filed a "Plaintiff's Response in Opposition to Defendants' Statement of Undisputed Facts," *see* (ECF 112, pp. 3-12), in which Plaintiff responds to each paragraph of Defendant's Statement of Undisputed Facts.

However, the Court considers only those statements in Plaintiff's Declarations based on Plaintiff's personal knowledge. *See* Fed. R. Civ. P. 56(c)(4); 28 U.S.C. § 1746. And, the Court will only consider those facts in Plaintiff's Statement of Additional Facts that are supported by evidence in the record. For example, paragraphs 57 and 58 of the April 4, 2016 Declaration are legal conclusions, not statements of fact, and, thus, will not be considered by the Court as facts. *See* (ECF 68, ¶¶ 57, 58).

find for the other party based on the evidence in the record." *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56 (a), (c). The moving party may discharge its initial responsibility by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also Spierer v. Rossman*, 798 F.3d 502, 508 (7th Cir. 2015). When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Spierer*, 798 F.3d at 507-08; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168-69 (7th Cir. 2013).

"Once the moving party puts forth evidence showing the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(c)(1), (e); *Flint v. City of Belvidere*, 791 F.3d 764, 769 (7th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1986)). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . .

3

consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 248-50.

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *McDowell v. Vill. of Lansing*, 763 F.3d 762, 764, 765 (7th Cir. 2014); *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## MOTION FOR LEAVE TO FILE SURREPLY

In his Motion Requesting Leave to File Sur-Reply to Defendant's Reply, Plaintiff asks the Court for leave to file a surreply, arguing generally that, in its Reply Brief in support of its Motion for Summary Judgment, Defendant has made improper legal contentions and relies on information that did not appear in Defendant's Statement of Undisputed Facts and Legal Argument in its opening brief. First, Plaintiff does not specifically identify in his motion what the improper legal contentions or new facts are; the Court will not search the proposed 17-page Surreply Brief to attempt to discern this information. Moreover, the Court is able to identify improper legal contentions and new facts on its own review of the parties' briefs. Finding, in its discretion, that additional briefing is unnecessary, the Court denies Plaintiff's Motion Requesting Leave to File Sur-Reply to Defendant's Reply.

## PLAINTIFF'S EVIDENTIARY OBJECTIONS

In his Response in Opposition, Plaintiff argues that some of the exhibits submitted by Defendant in support of her Motion for Summary Judgment fail to comply with the requirements of Federal Rules of Evidence 901 or 902. (ECF 113, p. 3); (ECF 112, p. 3, ¶ 13; p. 4, ¶ 15; p. 6, ¶¶ 26, 27; p. 7, ¶ 33; p. 8, ¶¶ 35, 36, 37, 39; p. 9). Thus, Plaintiff argues that the documents are inadmissible and cannot be used to support Defendants' Motion for Summary Judgment. In her Reply Brief, Defendant correctly notes that, in making this argument in his Response in Opposition, Plaintiff has failed to comply with Northern District of Indiana Local Rule 56-1(e), which requires that "[a]ny dispute regarding the admissibility of evidence should be addressed in a separate motion in accordance with L.R. 7-1." N.D. Ind. L.R. 56-1(e). In the interests of justice and in its discretion, the Court nevertheless considers Plaintiff's objections.

In its October 6, 2016 Opinion and Order on an earlier Motion to Strike filed by Plaintiff, the Court addressed Plaintiff's argument that the exhibits submitted in support of Defendant's Statement of Undisputed Material Facts in support of its Motion for Summary Judgment "do not conform to the authentication rules of the federal rules of evidence." (ECF 102, p. 2 (citing (ECF 101, p. 3))). The Court noted that Federal Rule of Civil Procedure 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); *see also Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) (recognizing that the Rules "allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as facts therein could later be presented in an admissible form."). At the time, the Court denied the motion because Plaintiff had not identified any specific examples of Defendant's exhibits that could not be presented in a form that would be admissible in evidence. *See* (ECF 102, p. 3). Plaintiff has now identified the exhibits.

Nevertheless, the ruling is the same. First, Plaintiff again has not shown that Defendant will not be able to present these materials in a form that would be admissible at trial. Second, Ronald Avina authenticates Exhibits 5, 6, and 7 in his Declaration, *see* (ECF 100, Ex. 4, ¶ 2), Bernyce Thompson authenticates Exhibits 12, 13, 14, 15, 16, 22, 26, and 28 in her Declaration, *see* (ECF 100, Ex. 24, ¶ 2), and R. Elaine Smith authenticates Exhibits 3, 7, 8, 10, 11, 17, 19, 21, 23, 25, 27, 29, in her Declaration, *see* (ECF 100, Ex. 30, ¶ 2). Exhibit 9 is page 4 of 5 of Plaintiff's signed May 30, 2013 EEO Investigative Affidavit. The Court overrules Plaintiff's objections.

Plaintiff also objects that paragraphs 32 and 39 of Defendant's facts are not supported by a citation. However, the paragraphs are identical to paragraphs 28 and 22 of Bernyce Thompson's declaration, respectively, and the Court will consider both paragraphs. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

## MOTION TO STRIKE

In its Motion to Strike, Defendant asks the Court to strike Plaintiff's exhibits on pages 28, 29, 58-59, 62-79, and 154 of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment as unauthenticated documents containing inadmissible hearsay. For the same reasons set out above regarding Plaintiff's objections, Defendant has not shown that Plaintiff would be unable to present these exhibits in admissible form at trial. *See* Fed. R. Civ. P. 56(c)(2); *Olson*, 750 F.3d at 714. Therefore, the Court overrules Defendant's objections based on authentication and hearsay and denies the Motion to Strike. However, the Court notes that the exhibits on pages 58 and 59 are illegible and, thus, cannot be considered.

6

## MATERIAL FACTS

1.    *Plaintiff's Job, Duties, and Supervisors*

Plaintiff David Dyson is a black male, born in 1956. (ECF 100, Ex. 1, p. 7, 8); (ECF 112, Ex. A, ¶ 3). Plaintiff is a high school graduate, and he studied industrial electricity at Shelton State Technical College from 1977-1979. *Id*. at p. 9.

In 1991, Plaintiff was hired by the United States Postal Service as a Mail Processing Equipment Mechanic ("MPE mechanic"). *Id*. at pp. 16-17; (ECF 68, ¶ 7). In 1995, Plaintiff went to the Gary, Indiana, Processing and Distribution Center ("Gary P&DC"). (ECF 100, Ex. 1, pp. 17-18, 21); (ECF 68, ¶ 7). He was an MPE mechanic at the Gary P&DC at all relevant times, including in 2012. (ECF 112, Ex. A, ¶ 4).

The terms and conditions of Plaintiff's employment with the United States Postal Service are set forth in the Collective Bargaining Agreement between the American Postal Workers Union, AFL-CIO (APWU) and the United States Postal Service. (ECF 68, ¶ 8); (ECF 112, Ex. A, ¶ 4).

There are three "tours" or shifts that the mechanics work. Tour I is 10:00 p.m. to 6:30 a.m.; Tour 2 is from 6:00 a.m. to 2:30 p.m.; and Tour 3 is from 2:00 p.m. to 10:30 p.m. (ECF 100, Ex. 4, ¶ 3). Plaintiff has always worked Tour 1 at the Gary P&DC and is the only MPE mechanic on Tour 1. (ECF 100, Ex. 1, p. 23-24, 65); (ECF 100, Ex. 24, ¶ 3). Plaintiff's primary duty is to fix the mail processing equipment machines. *Id*. at p. 18. Plaintiff is responsible for maintenance, cleaning, and fixing mail sorting machines like the APBS and the FMS 100. *Id*. at pp. 19-20. Plaintiff testified that the MPE mechanics do "[w]hatever it takes to maintain and fix the equipment." *Id*. at p. 20. The maintenance department is responsible for maintaining, repairing, and keeping machines functioning so that the operations department can process the mail. (ECF 100, Ex. 24, ¶ 2).

Bernyce Thompson, a black female, was the Acting Supervisor of Maintenance Operations assigned to Tour I at the Gary P&DC beginning in 2009, and, in approximately 2014, she became the Supervisor of Maintenance Operations assigned to Tour I at the Gary P&DC. (ECF 100, Ex. 24, ¶ 1). Thompson was Plaintiff's supervisor at all relevant times. (ECF 100, Ex. 18, ¶ 3).

From 2010 through October 2014, Karla Forte was the Supervisor of Maintenance Operations on Tour 2. (ECF 100, Ex. 18, ¶ 2). Forte is a black female. *Id*. at ¶ 1. Forte usually arrived at the Gary P&DC for Tour 2 at approximately 5:00 a.m. or 5:30 a.m. *Id*. at ¶ 4. Forte stated that her interactions with Plaintiff were limited and infrequent; Forte did not supervise Plaintiff on his regularly scheduled work days. *Id*. at ¶¶ 3, 5.

At all relevant times, Ronald Avina was the Supervisor of Maintenance Operations on Tour 3 at the Gary P&DC. (ECF 100, Ex. 4, ¶¶ 1,3). Avina, a male, states that his race is "Mexican." *Id*. at ¶ 1. Avina supervises the Custodians, MPE mechanics, and Electronic Technicians ("ET"). *Id*. at ¶ 3. Avina was responsible for making the regular and overtime schedule for MPE mechanics and ETs for all three Tours. *Id*. at ¶ 4; *see also* (ECF 100, Ex. 19, p. 2).

At all relevant times, Lawanda Fox was the Acting/Manager of Maintenance Operations. (ECF 100, Ex. 19, p.2) (Fox EEO Investigative Affidavit). Fox is a black female. *Id*. at p. 1. Dyson understood Fox to be a supervisor. (ECF 100, Ex. 1, p. 22).

2.    *September 2012 Cancelled Overtime*

In 2012, Plaintiff's non-scheduled days were Sunday and Monday, which Plaintiff describes as Saturday and Sunday because his shift on Tour I runs from 10:00 p.m. to 6:30 a.m. *See* (ECF 100, Ex. 1, p. 24); (ECF 100, Ex. 7); (ECF 100, Ex. 25); (ECF 100, Ex. 30, p. 2). Tour 1 begins at 10:00 p.m. on one day and ends the following day; the service date for Tour 1 is the date in which the Tour

1 employee performs the majority of the work day, which is the following day. (ECF 100, Ex. 30, p. 2).

On Wednesday, September 19, 2012, the weekly work schedule listed Plaintiff as working overtime on Sunday, September 23, 2012. (ECF 100, Ex. 29) (covering Tour 3); (ECF 68, ¶ 10); (ECF 112, Ex. A., ¶ 6)

On Thursday, September 20, 2012, at approximately 9:15 p.m., Plaintiff notified his employer that he had to take leave from his scheduled shifts on Friday and Saturday due to a family emergency (i.e. for the next two shifts that would start in approximately 45 minutes). (ECF 100, Ex. 1, p. 30); (ECF 100, Ex. 8); (ECF 68, ¶ 11); (ECF 112, Ex. A., ¶ 8).

An "unscheduled absence" is one "not requested and approved in advance." (ECF 100, Ex. 11, p. 2, § 511.41).

The next day, Friday, September 21, 2012, Plaintiff received a phone call in the afternoon from Supervisor Avina who told Plaintiff that his overtime was cancelled for Sunday, September 23, 2012. (ECF 100, Ex. 1, p. 30); (ECF 68, ¶ 12); (ECF 112, Ex. A, ¶ 9). Avina did not give Plaintiff a reason, either verbally or in writing, for cancelling Plaintiff's overtime. (ECF 112, Ex. A, ¶ 10). Plaintiff verified the cancellation with Fox on September 22, 2012. (ECF 100, Ex. 1, p. 31); (ECF 68, ¶¶ 13, 14); (ECF 112, Ex. A, ¶¶ 11, 12). Plaintiff states that Fox did not give Plaintiff a reason for cancelling the overtime. (ECF 68, ¶ 14); (ECF 112, Ex. A, ¶ 12). Fox did not communicate to Plaintiff that she relied on Article 8.5.C.1.b in making the decision. (ECF 112, Ex. A, ¶ 13).

The "Agreement" between United States Postal Service and APWU for 2010-2015 (Handbook EL-912) provides, in relevant part under the heading "Section 5. Overtime Assignments":

C.    1.    a.    When during the quarter the need for overtime arises, employees with the necessary skills having listed their names will be selected in order of their seniority on a rotating basis.

b.    Those absent or on leave shall be passed over.

(ECF 100, Ex. 21).

In a March 27, 2013 email regarding Plaintiff's EEO complaint related to the cancelled September 23, 2013 overtime, Manager Fox explained that, because Plaintiff was on leave, the decision was made not to give him overtime under APWU contract article 8.5.C1.b. (ECF 100, Ex. 23). In her May 24, 2013 U.S. Postal Service EEO Investigative Affidavit (Witness), Fox again explained that Plaintiff's September 23, 2012 overtime was cancelled because of section 5.C of the Agreement and that she instructed Avina to notify Plaintiff that he was not needed for the overtime on September 23, 2012. (ECF 100, Ex. 19, p. 2); *see also* (ECF 100, Ex. 23).

Fox states in the EEO Investigative Affidavit that race and sex were not a factor in her decision to cancel Plaintiff's September 23, 2012 overtime. (ECF 100, Ex. 19, p. 3).

In Plaintiff's place, Johnnie Harris was scheduled to work the overtime on Tour 3 on September 23, 2012. (ECF 100, Ex. 9). Harris is an African-American male. (ECF 100, Ex. 30, ¶ 14). He had prior EEO activity in 2010. (ECF 100, Exs. 27, 30 ¶ 14).

Paula Garton is a white female. (ECF 100, Ex. 1, p. 33); (ECF 112, Ex. A, ¶ 14). In 2012, Garton was an MPE mechanic working at Gary P&DC. (ECF 112, Ex. A, ¶ 14). Garton was scheduled to work overtime on Sunday, October 28, 2012. (ECF 100, Ex. 3). On October 9, 2012, Garton submitted a request for leave of absence for Thursday and Friday, October 25 and October 26, 2012, which was denied. (ECF 68, ¶ 15); (ECF 112, Ex. A, ¶ 15). On October 24, 2016, Garton reported that she was unable to work on October 25 and October 26, 2012. (ECF 68, ¶16); (ECF 112, Ex. A, ¶ 16). Garton did not work on Thursday and Friday October 25 and October 26, 2012.

10

(ECF 100, Ex. 10). Garton's 3972 Absence Analysis form for Leave Year 2012 is marked "uSL-8" for both dates. (ECF 100, Ex. 10). Garton worked her regular shift on Saturday, October 27, 2012. Garton then worked the scheduled overtime on Sunday, October 28, 2012. *Id.* Garton works on Tour 2, and Forte is her supervisor. *Id.* at p. 32-33.

In her Affidavit, R. Elaine Smith, Labor Relations Specialist for the United States Postal Service, explains that "the difference between Garton and [Plaintiff] is that Garton reported to work on Saturday, October 27, 2012, the day preceding the scheduled overtime, whereas [Plaintiff] did not work the day before his scheduled overtime." (ECF 100, Ex. 30, ¶ 17) (citing Garton's leave requests, Garton's 3972 Form, and Plaintiff's 3972 form).

At his deposition, Plaintiff testified that he did not know if Garton was off work the day before she worked overtime. (ECF 100, Ex. 1, pp. 91-92). When asked whether it would be a different situation if Garton had worked the day before she was supposed to work the overtime, Plaintiff responded, "If she worked the day before? That would, I believe, be different." *Id.* at p. 92.

Bernyce Thompson, Plaintiff's supervisor, did not prepare the regular, overtime, or holiday schedules for the MPE mechanics and ETs in 2012-2014. Avina was responsible for making the regular and overtime schedule for MPE mechanics and ETs for all three Tours. *Id.* at ¶ 4; *see also* (ECF 100, Ex. 19, p. 2). Plaintiff's understanding is that a supervisor or a manager can cancel overtime. (ECF 100, Ex. 1, p. 31).

On January 6, 2013, Gary Area Local 266's Step 2 designee, Robert L. Hock III, issued a Correction and Additions GAL1245RH in relation to Plaintiff's cancelled September 23, 2013 overtime, which states: "Possible[sic] had management not shown feminist favoritism to a female employee by calling her and telling her that she could not work her off days as posted this might not be an issue." (ECF 112, p. 154– "Exhibit 4" to Pl. 12/19/2016 Decl.). The letter also opines that

11

management treated Plaintiff inequitably in relation to Garton. *Id*. This letter is date stamped as having been received by Gary P&DC on January 7, 2013. *Id*.

Plaintiff filed a grievance regarding the cancellation of the September 23, 2012 overtime. (ECF 100, Ex. 30, ¶ 15); (ECF 100, Ex. 19, p. 3). On March 12, 2013, Plaintiff was called into Thompson's office, and, in the presence of Avina, Thompson informed Plaintiff that she received a memo indicating that Plaintiff should select a day to make up the eight hours of overtime. (ECF 68, ¶ 27); (ECF 112, Ex. A, ¶ 28). Plaintiff asked if the question was related to his pending EEOC complaint, which he had filed in February 2013. *Id*. Thompson responded, "I do not know." *Id*. The grievance was settled on May 16, 2013, with the resolution that Plaintiff be given the opportunity to work eight hours overtime. (ECF 100, Ex. 30, ¶ 15); (ECF 100, Ex. 19, p. 3). Plaintiff made up the eight hours of overtime. (ECF 100, Ex. 1, p. 130).

3.    *Holiday Schedule 2012*

At all relevant times, Supervisor Avina was responsible for making the regular and overtime schedule for MPE mechanics and ETs for all three tours. (ECF100, Ex. 4, ¶ 4). Neither Thompson nor Forte was responsible for making the regular or overtime schedules for MPE mechanics or ETs in 2012. (ECF 100, Ex. 24, ¶ 4); (ECF 100, Ex. 18, ¶ 12). For holiday scheduling, Avina scheduled employees to work the 2012 Christmas holiday based on the mail processing equipment that would be running on each tour and the seniority of the employees. (ECF 100, Ex. 4, ¶ 9). The Manager of Distribution Operations decided what mail processing equipment, if any, would be running on each tour and provided Avina with a Holiday Operating Plan that included information that the first class mail processing equipment was scheduled not to be in operation during the 2012 Christmas holiday on Tour I (10:00 p.m. on December 24, 2012, to 6:30 a.m. on December 25, 2012). *Id*. at ¶ 10; (ECF 100, Ex. 5). Plaintiff avers that, prior to December 15, 2012, Gary P&DC's Supervisor of

Distribution Operations Monica Glines informed Plaintiff that she required a mechanic for the night of December 24, 2012. (ECF 68, ¶ 18); (ECF 112, Ex. A, ¶ 19).

Employees sign the Holiday list if they desire to work over the Christmas holiday. (ECF 100, Ex. 4, ¶ 17). Plaintiff signed the list to work overtime, and he was aware that he may be assigned to work any Tour. (ECF 100, Ex. 1, pp. 37, 42); (ECF 68, ¶ 19); (ECF 112, Ex. A, ¶ 20).

Avina scheduled Plaintiff to work on December 25, 2012, from 6:00 a.m. to 2:30 p.m. (ECF 100, Ex. 15); (ECF 68, ¶ 25); (ECF 112, Ex. A, ¶ 26). Plaintiff also had to work his regular shift later that day, beginning at 10:00 p.m. on December 25, 2012, and finishing at 6:30 a.m. on December 26, 2012; this was not considered the December 25, 2012 holiday because it was Plaintiff's regular shift for December 26, 2012. (ECF 100, Ex. 4, ¶¶ 13, 14); (ECF 68, ¶ 25).

Avina did not schedule any MPE mechanic to work the Christmas 2012 holiday for Tour I (from 10:00 p.m. on December 24, 2012, to 6:30 a.m. on December 25, 2012) because the first class mail processing equipment was not going to be utilized during that time. (ECF 100, Ex. 4, ¶¶ 10, 11, 12); (ECF 100, Ex. 6); (ECF 68, ¶ 20); (ECF 112, Ex. A, ¶ 21). Avina's decision to schedule Plaintiff to work on Tour 2 from 6:00 a.m. to 2:30 p.m. on December 25, 2012, was based on (1) the Holiday rotation list; (2) Plaintiff's seniority; (3) information from the Manager, Distribution Operations that the first class mail processing equipment was scheduled not to be in operation during the 2012 Christmas holiday on Tour 1; and (4) Avina's determination that Plaintiff's services were needed to help complete the daily preventative maintenance on mail processing equipment that was assigned to Tour 2 MPE mechanics. (ECF 100, Ex. 4, at ¶ 13).

Plaintiff recalls in the past that the Holiday schedule resulted in his ability to "swap" with another employee so that they worked the Tour they normally work:

13

So I normally signed up to work my holidays. The mechanic that has more seniority than I have, he gets according to the pecking order, what have you. He goes first. They go by tour. Tour 1 gets slotted in, Tour 2, Tour 3. Senior guy, next guy, next guy.

. . . .

Well, most of the time the senior guy, he works Tour 2 and I work Tour 1. He gets slotted in to work Tour 1, and I get slotted in to work Tour 2, so we basically are switching tours.

So what we basically do when we're scheduled to work each other's tour, we contact the supervisor and let him know our intentions to swap. So we'll maintain our regular tour that we normally work.

(ECF 100, Ex. 1, p. 40-41). For example, Supervisor Avina stated that, the employee with more seniority, Mr. Maffett, was on the holiday list for Christmas 2012; if an MPE mechanic had been needed to work the Christmas 2012 holiday for Tour 1 (from 10:00 p.m. on December 24, 2012, to 6:30 a.m. on December 25, 2012), Mr. Maffett would have been assigned the work over Plaintiff because Mr. Maffett had more seniority than Plaintiff. (ECF 100, Ex. 4, ¶ 17). Avina was aware that sometimes the MPE mechanics agreed between themselves to switch their overtime assignments in order to work their regularly assigned tour of duty on their non-scheduled day; however, Avina does not consider possible swapping as a factor when making the overtime schedule. *Id*. at ¶ 18. Employees are never required to swap with each other. *Id*.

Avina stated in his Declaration that Plaintiff's race was not a factor in his decisions regarding the overtime schedule for MPE mechanics and ETs for the Christmas holiday in December 2012. *Id*. at ¶ 19. He also stated that Plaintiff's sex was not a factor in his decision regarding the overtime schedule for MPE mechanics and ETs for the Christmas holiday in December 2012. *Id*. at ¶ 20. In December 2012, Avina was not aware of Plaintiff's prior participation in any Title VII or EEO activity. *Id*. at ¶ 21.

14

Plaintiff states that he informed Supervisor Glines that no MPE mechanic was scheduled for the Tour I shift beginning at 10:00 p.m. on December 24, 2012. (ECF 68, ¶ 21); (ECF 112, Ex. A, ¶ 22). Plaintiff states that Glines informed him that she would communicate with Fox. *Id*. Plaintiff states that Glines subsequently informed him that, according to Fox, the schedule for that shift would be partially filled by extending the four hours of overtime to the Tour 3 mechanic. (ECF 68, ¶ 22); (ECF 112, Ex. A, ¶ 23).

Plaintiff states that, on January 23, 2013, he spoke with Thompson and suggested that she stay out of his conflict with Fox. (ECF 68, ¶ 26); (ECF 112, Ex. A, ¶ 27). He also made the statement to Thompson that he had filed a case with the EEOC. (ECF 68, ¶ 26); (ECF 112, Ex. A, ¶ 27).

*4.    EEOC Charge of Discrimination*

On February 22, 2013, Plaintiff filed an EEOC Charge of Discrimination, complaining of unlawful discrimination and retaliation. (ECF 68, ¶ 1).[2]

*5.    Changes in the Work Assignment Sheets Between March 2013 and September 4, 2013*

A "route" is a task or assignment. (ECF 100, Ex. 24, ¶ 7). There may be several steps to complete a route. *Id*. Routinely, Supervisor Thompson prepares daily assignment sheets for all of her employees on Thursday for the week. *Id*. The employees receive their assignment sheets at the beginning of the Tour each day. *Id*. However, Thompson has daily "Plan 5" meetings, which are informational meetings, at 10:05 p.m. to inform employees of any problems, additional tasks, or issues. *Id*. The meetings last 5-10 minutes. *Id*.

---

[2] Although the Third Amended Complaint cites Exhibit 1 thereto as the EEOC charge, there is no Exhibit 1 or Exhibit 2 attached to the Third Amended Complaint.

15

Sometime in 2013, Tour 1 needed to assist Tour 2 with the Automated Parcel and Bundle Sorter (APBS) route. *Id*. at ¶ 8. Thompson was aware that Plaintiff had performed the APBS route in the past, so she decided to assign this route to Plaintiff. *Id*. at 8-9. The APBS route includes conducting mail searches, downloading any updates to the computer, and cleaning for debris. *Id*. at 10. The mail search includes checking all the chutes for mail. *Id*. The daily route for the APBS took 1.8 hours to complete. *Id*. If operations on the APBS finalized when there was enough time left in Plaintiff's tour for him to complete the APBS route, Thompson would assign him the route and expect him to complete it. *Id*. However, if operations on the APBS finished when there was not enough time left in Plaintiff's tour for him to complete the APBS route, Thompson would still assign him the route; however, he was only expected to start the route and then turn over what he did not finish to Tour 2. *Id*. Plaintiff recalls being told that if he performed at least one hour of the task, it could be signed off as completed. (ECF 100, Ex. 1, p. 103).

Because Thompson prepares the daily assignment sheets in advance, she would often verbally tell Plaintiff when the APBS route was added to his duties either during the Plan 5 meeting or when the operations on the APBS were finished so he could start the route. (ECF 100, Ex. 24, ¶ 11). Later, Thompson would print out the revised assignment sheet with the additional duty. *Id*. Plaintiff understood that a supervisor can change his duties throughout the day and that the needs of the shift may change throughout the day. (ECF 100, Ex. 1, pp. 85-86).

Plaintiff testified that on some dates he was not able to complete the APBS route and that he passed it along to the next Tour. (ECF 100, Ex. 1, pp. 86, 96). Plaintiff was never suspended or disciplined for the times that he did not complete his work on the APBS machine. *Id*. at pp. 96, 104-05, 110, 112, 116.

16

On September 4, 2013, Plaintiff participated in an investigative interview conducted by Thompson, in the presence of Union Representative Benjamin Barnes, regarding Plaintiff not having finished daily maintenance duties on August 28, 2013. (ECF 68, ¶ 29); (ECF 112, Ex. A, ¶ 30). Plaintiff believes that the investigative interview was unwarranted. (ECF 68, ¶¶ 29-30); (ECF 112, Ex. A, ¶¶ 30-31).

6.    *Incomplete Work and Investigative Interview*

Plaintiff was expected to log in to the Electronic Condition Based Maintenance program ("eCBM") and indicate the tasks he completed regarding the APBS route. (ECF 100, Ex. 24, ¶ 12). Closing out the tasks in eCBM informs anyone else who works on the machine that the closed-out tasks or steps have been completed. *Id*.

On or about September 4, 2013, Supervisor Thompson instructed Plaintiff to start the APBS route. *Id*. at ¶ 13. Plaintiff did not close out the tasks that he finished on the APBS route in the eCBM. *Id*. Supervisor Forte, the supervisor for Tour 2, was upset that Plaintiff had failed to close out in eCBM the tasks that he had finished on the APBS route. *Id*.; (ECF 112, p. 45–"Exhibit C").

On September 5, 2013, Thompson conducted an investigative interview to investigate Plaintiff's failure to close out tasks in eCBM he had finished on the APBS route on September 4, 2013. (ECF 100, Ex. 24, ¶ 14). Plaintiff admitted that he did not close out the items in eCBM that he had completed. *Id*. Thompson informed Plaintiff that no further action was necessary. *Id*.; *see also* (ECF 100, Ex. 28). The investigative interview took approximately 18 minutes. (ECF 100, Ex. 24, ¶ 14); (ECF 100, Ex. 28). No discipline was issued to Plaintiff as a result of the September 5, 2013 investigative interview. *Id*. at ¶ 15. Plaintiff did not lose any pay nor was he suspended. (ECF, Ex. 1, pp. 83, 86, 87).

However, Plaintiff feels that the investigative interview itself is a form of discipline. *Id.* at p. 84). Thompson and Forte state in their Declarations that an investigative interview is not discipline in and of itself. (ECF 100, Ex. 18, ¶ 10); (ECF 100, Ex. 24, ¶ 17). Rather, the purpose of an investigative interview is to find out what happened so that the supervisor has all the information available when deciding whether or not to impose discipline. (ECF 100, Ex. 18, ¶ 10); (ECF 100, Ex. 24, ¶ 17). All supervisors and managers conducting an investigative interview must advise every employee that the interview could lead to corrective action, up to and including removal. (ECF 100, Ex. 18, ¶ 11); (ECF 100, Ex. 24, ¶ 18).

*7.    January 2014 Email*

On or about January 22, 2014, Michael Hagler, the Manager of Transportation/Networks at the Gary P&DC, forwarded to Supervisor Thompson an email chain regarding missing mail pieces that were found on an APBS at another postal plant. (ECF 100, Ex. 24, ¶ 20). The email explained that missing mail would not be visible during a daily mail search and a more thorough mail search would be needed to find this mail. *Id.*; (Ex. 22). The email did not reference Plaintiff or anything that happened in Gary, Indiana. (ECF 100, Ex. 1, p. 48). The email was sent not only to Thompson, who was the Tour I Supervisor, but also to the Supervisors of Tours 2 and 3—Forte and Avina.

Thompson gave Plaintiff a printed copy of the email for informational purposes. (ECF 100, Ex. 24, ¶ 20); (ECF 68, ¶ 32); (ECF 112, Ex. A, ¶ 33). Thompson did not give a copy of the email chain to any MPE mechanic other than Plaintiff because Plaintiff was the only MPE that Thompson supervised on Tour 1. (ECF 100, Ex. 24, at ¶ 21); (ECF 100, Ex. 1, p. 49); (ECF 68, ¶ 33); (ECF 112, Ex. A, ¶ 34). Plaintiff was not issued any discipline regarding this issue nor did his duties or assignments change. (ECF 100, Ex. 1, p. 49); (ECF 100, Ex. 24, ¶ 20). Plaintiff characterized Thompson's statement regarding the email as a "stern warning." (ECF 100, Ex. 1, pp. 49-50).

Plaintiff testified that Thompson said, "[W]e have to make sure that all the mail is accounted for." *Id.* at p. 50.

Plaintiff believes that the letter does not apply to his work because he is not assigned the duties and responsibilities to conduct the bi-monthly route task, and he states that Thompson knew that he did not perform the bi-monthly route task. (ECF 68, ¶ 34); (ECF 112, Ex. A, ¶ 35).

8.    *EEOC Hearing Notice*

On August 25, 2014, the EEOC issued a Prehearing Order, EEOC NO. 470-2014-00037X, indicating that a hearing was scheduled for November 20, 2014. (ECF 68, ¶ 36); (ECF 112, Ex. A, ¶ 37).

9.    *Deems Desired List—October 10, 2014*

The "deems desirable" list is a list that is used for employees who call off work around a holiday. (ECF 100, Ex. 1, p. 62); (ECF 68, ¶ 38); (ECF 112, Ex. A, ¶ 39). On or about October 10, 2014, Thompson told Plaintiff that he was on the "deems desirable" list. (ECF 100, Ex. 1, p. 63, 64); (ECF 68, ¶ 37); (ECF 112, Ex. A, ¶ 38). Plaintiff was not disciplined in relation to the "deems desirable" list. (ECF 100, Ex. 1, p. 64). Thompson never mentioned the "deems desirable" list again. *Id.* at p. 65.

10.    *Request to Repair Machine #14—September 15, 2015*

On September 15, 2015, Supervisor Thompson assigned Plaintiff to repair a broken belt on DBCS machine # 14. (ECF 100, Ex. 24, ¶ 23); (ECF 100, Ex. 1, pp. 52, 56); (ECF 68, ¶¶ 43-45); (ECF 112, Ex. A, ¶ 44-46). Plaintiff had fixed belts on other machines. (ECF 100, Ex. 1, p. 57). Plaintiff did not attempt to complete the task because Plaintiff is not trained to service any DBCS machines. (ECF 68, ¶ 41); (ECF 112, Ex. A, ¶ 42); (ECF 100, Ex. 24, ¶ 26). After Plaintiff told Thompson that he was not qualified to service the DBCS machine, Thompson called ET Ben Barnes,

who fixed the broken belt. (ECF 100, Ex. 1, p. 58); (ECF 68, ¶ 49); (ECF 112, Ex. A, ¶ 50). Plaintiff did not watch Barnes repair the belt. *Id*. Plaintiff did not touch the machine, and Thompson did not force Plaintiff to touch the machine. *Id*. at pp. 60-61; (ECF 100, Ex. 24, ¶ 27). Plaintiff was not injured in relation to this event. (ECF 100, Ex. 1, p. 60). Plaintiff was not disciplined for not fixing the belt. (ECF 100, Ex. 24, ¶ 27); (ECF 100, Ex. 1, pp. 60-61). Plaintiff completed a Report of Hazard, Unsafe Condition or Practice form related to the request that he fix the belt on the basis that Thompson directed him to commit an unsafe act in working on machinery outside his training. (ECF 100, Ex. 24, ¶ 26); (ECF 100, Ex. 1, p. 59); (ECF 100, Ex. 16); (ECF 68, ¶ 50); (ECF 112, Ex. A, ¶ 51).

Plaintiff states that Thompson knows that he does not possess the knowledge, training, and skills to service the DBCS machine. (ECF 68, ¶ 42); (ECF 112, Ex. A, ¶ 43). Plaintiff states that, initially, Thompson demanded that Plaintiff report to the DBCS 14 machine to service it, which Plaintiff states is contrary to Article 38.6, Section 6, of the CBA. (ECF 68, ¶ 47); (ECF 112, Ex. A, ¶ 48).

## 11.   *Supervisor Thompson's Decisions*

Supervisor Thompson states in her Declaration that Plaintiff's race has not been a factor in her decisions regarding assignments of any duties, routes, or tasks Plaintiff. (ECF 100, Ex. 24, ¶ 38). She also states in her Declaration that Plaintiff's sex has not been a factor in her decision regarding work assignments of any duties, routes, or tasks to Plaintiff. *Id*. at ¶ 39. Thompson further states that Plaintiff's participation in the EEO process has not been a factor in any of Thompson's decisions regarding assignments of any duties, routes, or tasks to Plaintiff. *Id*. at ¶ 40.

12.    *January 2016 Absences and Requests for Medical Documentation*

On January 6, 2016, at approximately 11:35 p.m., a belt broke on a Flat Sorter Machine ("AFSM 100"). (ECF 100, Ex. 24, ¶ 28). Thompson assigned Plaintiff to fix this belt at 11:40 p.m. *Id.*[3] Thompson informed Plaintiff that he only had one hour from midnight to 1:00 a.m. to fix the machine because Operations needed to run the machine by 1:00 a.m. so that the mail could be sorted and processed for the mail carriers. *Id.* at 11:45 p.m., Thompson called Plaintiff on the radio and told him that Operations was sending the clerks on break at midnight and that Plaintiff could repair the machine at that time. *Id.*

At 12:40 a.m., Lead Clerk Michelle Westbrooks called Thompson to tell her that Plaintiff never arrived to work on the machine. *Id.* at ¶ 29. Thompson called Plaintiff on the radio for his location and he said, "I'm on break." *Id.* Thompson asked him how he could be on break when Operations gave them an hour window to replace the belt. *Id.* Thompson received no response from Plaintiff. *Id.* Thompson then asked Plaintiff to report to the office. *Id.* He did not arrive at the office. *Id.* Thompson called him on the radio again to report to the AFSM 100. *Id.* Plaintiff arrived at 12:50 a.m. *Id.* Thompson told Plaintiff that they had lost the window of opportunity and now the machine would have to run with only two feeders. *Id.*; *see also* (ECF 100, Ex. 26). Plaintiff was ill. (ECF 68, ¶ 51); (ECF 112, Ex. A, ¶ 52). After further conversation, Plaintiff told Thompson that he was going home and requested 24 hours (three work days) of sick leave. (ECF 100, Ex. 26); (ECF 100, Ex. 24, ¶ 30); (ECF 100, Ex. 1, p. 68); (ECF 100, Ex. 13).

When he made the request, Plaintiff did not know if he was going to be sick for three days but he believed that he could take 24 hours of sick leave without documentation. (ECF 100, Ex. 1,

---

[3] Although Thompson's Declaration lists the time as "11:40 a.m.", all other references in the paragraph of the Declaration suggest that the correct time was "11:40 p.m." *See* (ECF 100, Ex. 24, ¶ 28).

p. 69). Thompson told Plaintiff that he would need documentation for his sick time by January 8, 2016. (ECF 100, Ex. 1, p. 69); (ECF 100, Ex. 24, ¶ 30); (ECF 100, Exs.13, 26). Thompson wrote "DOC requested by close of business January 8, 2016" on Plaintiff's leave request slip. *Id.*; (ECF 100, Ex. 13); (ECF 100, Ex. 1, p. 73). Plaintiff saw this notation about providing documentation when he signed the leave request form. (ECF 100, Ex. 1, p. 73).

The United States Postal Service's Employee and Labor Relations Manual ("ELM"), Chapter 5, Section 513.36 provides that medical documentation or other acceptable evidence of incapacity for work or need to care for a family member "is required . . . when the supervisor deems documentation desirable for the protection of the interests of the Postal Service." (ECF 100, Ex. 12); (ECF 100, Ex. 24, ¶ 31).

Plaintiff returned to work on January 11, 2016, after he recovered from his illness; he did not provide documentation until January 13, 2016. (ECF 100, Ex. 1, pp. 69-70, 74); (ECF, Ex. 14); (ECF 100, Ex. 24, ¶ 32); (ECF 68, ¶¶ 52, 53); (ECF 112, Ex. A, ¶¶ 53, 54).

On January 13, 2016, at 3:30 a.m., Thompson conducted an investigative interview with Plaintiff regarding his failure to follow instructions to fix the belt on January 6, 2016, and regarding not submitting the documentation by January 8, 2016. (ECF 100, Ex. 24, ¶ 35); (ECF 68, ¶ 54); (ECF 112, Ex. A, ¶ 55). The investigative interview did not lead to any discipline being issued to Plaintiff. (ECF 100, Ex. 24, ¶ 35). Thompson considered Plaintiff to have been absent without leave ("AWOL") during the three-day absence. (ECF 100, Ex. 1, p. 75); (ECF 68, ¶ 53); (ECF 112, Ex. A, ¶ 54).

On January 27, 2016, Plaintiff filed a grievance with the Union. (ECF 68, ¶ 55); (ECF 112, Ex. A, ¶ 56). On January 27, 2016, Union Steward representative Phillip A. Radford spoke with Thompson "concerning the impropriety of placing USPS employee and APWU member [Plaintiff]

22

on AWOL status on the 13th Day of January, 2016." (ECF 112, p. 155–"Exhibit 5" to Pl. 12/19/2016 Decl.). Sometime after January 10, 2016, Union President Robert Hock spoke with Gary P&DC Maintenance Manager Rodney B. Lane to "make the necessary corrections for [Plaintiff] being wrongfully deprived of pay for the time period January 6-10, 2016." (ECF 112, p. 156–"Exhibit 6" to Pl. 12/6/2016 Decl.). Plaintiff was later paid for these dates. (ECF 100, Ex. 1, p. 76); (ECF 68, ¶ 56); (ECF 112, Ex. A, ¶ 59).

13.    *Other Facts*

On June 7, 2014, Thompson first became aware of Plaintiff's EEO activity in an email sent by the Unites States Postal Service's representative concerning issues raised in an EEOC Case pending in Indianapolis before an Administrative Judge. (ECF 100, Ex. 24, ¶ 22). Thompson states in her Declaration that, prior to June 7, 2014, Thompson was not aware of Plaintiff engaging in any EEO activity. *Id*.

As of the date of his deposition, June 27, 2016, Plaintiff had no other investigative interview in 2016. As of September 14, 2016, the United States Postal Service had not issued any discipline to Plaintiff in any year from 2012 to 2016. *Id*. at ¶ 37.

Thompson had found Plaintiff sleeping on the job but she did not discipline him. (ECF 100, Ex. 1, p. 121).[4]

---

[4] In his Response in Opposition to Defendant's Statement of Undisputed Facts, Plaintiff admits that he testified that Thompson has caught him sleeping on the job and that she did not discipline him. (ECF 112, p. 11, ¶ 41). Plaintiff then states, "Answering further, SMO Thompson did issue a[sic] official disciplinary letter of warning (See Exhibit 6 attached hereto) and conducted an investigation interview with Union Representative Paulet Jackson). *Id*. The Court is unable to locate an Exhibit 6 at docket entry 112 that contains an official disciplinary letter of warning related to Plaintiff falling asleep. The Court has looked at Plaintiff's other filings of exhibits, *see* (ECF 1, 68, 88, 112), and has not located the referenced document. Plaintiff did not reference an official disciplinary letter of warning in his deposition in relation to being caught sleeping. *See* (ECF 100, Ex. 1, pp. 121-22).

In the record, there is (1) a September 5, 2013 investigative interview by Thompson with Union Official Benjamin Barnes regarding the APBS machine, (ECF 100, Ex. 28), and (2) a January 13, 2016 investigative interview by Thompson with Union Official Benjamin Barnes regarding January 6, 2016, (ECF 100, Ex. 15).

Plaintiff remains employed by the USPS as an MPE mechanic.

## ANALYSIS

In his Third Amended Complaint, Plaintiff David R. Dyson brings claims under Title VII for race discrimination (Count I), sex discrimination (Count II), harassment and hostile work environment (Count III), and retaliation (Count IV). Defendant seeks summary judgment on all four claims, and the Court considers Defendant's motion as to each claim in turn.

1.    *Race and Sex Discrimination*

In Counts I and II of his Third Amended Complaint, Plaintiff alleges a violation of Title VII when Defendant acted with racial and gender animus toward him by intentionally or with deliberate indifference not affording him, a black male, the same employment rights as afforded employee Paula Garton, a white female. Plaintiff clarifies in his Response in Opposition to Defendant's Statement of Undisputed Facts that his claims of unlawful race and sex discrimination are based only the cancellation of his overtime in September 2012 when compared with Paula Garton whose overtime was not cancelled in October 2012. *See* (ECF 112, p. 6, ¶ 19).

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit Court of Appeals abandoned the dichotomy of direct and indirect evidence on summary judgment in employment discrimination cases and held that, the "sole question that matters" is whether a reasonable juror could conclude that the plaintiff would not have suffered the adverse employment action if he had a different ethnicity, race, sex, religion, or other proscribed factor, and everything else had remained the same. 834 F.3d 760, 764, 766 (7th Cir. 2016) (citing *Achor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997); *Troupe v. May Dep't Stores Co.*, 20 F.3d

24

734 (7th Cir. 1994)). The court also jettisoned the "convincing mosaic" as a legal standard. *Id.* Rather, all evidence should be considered together to understand the pattern it reveals. *Id.* (discussing *Troupe*). The court held that "district courts must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Id.* at 765. Finally, the court clarified that its decision did not concern the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or any other burden-shifting framework. 834 F.3d at 766. *Ortiz* was decided on August 19, 2016, a month before the instant Motion for Summary Judgment was filed and, thus, governs the instant ruling. Plaintiff does not invoke the *McDonnell Douglas* burden-shifting framework in opposition to the motion for summary judgment. *See* (ECF 113).[5]

Thus, at the summary judgment stage in this case, the proper question before the Court is whether the evidence would permit a reasonable factfinder to conclude that Plaintiff's race and sex caused plaintiff's adverse employment action. *Ortiz*, 834 F.3d at 765. Viewing the facts in the light most favorable to Plaintiff and for the purposes of this motion, the Court assumes that Plaintiff suffered an adverse employment action when his overtime was cancelled for September 23, 2012, because he did not receive that pay until over six months later and only after he filed a grievance. However, Plaintiff offers no evidence that would permit a factfinder to conclude that it was Plaintiff's race or sex that caused his overtime to be cancelled. Notably, the employee who replaced Plaintiff for the cancelled September 23, 2012 overtime was Johnnie Harris, a black male.

---

[5] Plaintiff does not cite *Ortiz* and instead cites earlier cases setting out the former analysis of direct and circumstantial evidence under the "direct method." *See* (ECF 113, pp. 7-8). Although this structure has fallen away since *Ortiz*, the Court nevertheless considers all of the evidence and argument set out by Plaintiff to determine whether a reasonable juror could find that Plaintiff suffered discrimination, harassment, or retaliation.

As evidence of discrimination, Plaintiff offers Paula Garton as a similarly situated employee. "The similarly-situated analysis calls for a 'flexible, common-sense' examination of all relevant factors." *See Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quoting *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007)). Indeed, in the year 2012, Plaintiff and Garton were both MPE mechanics in the Maintenance Department at USPS Gary P&DC. And, although Plaintiff and Garton had different immediate supervisors for their different Tours—Thompson and Forte respectively, for purposes of this issue regarding the scheduling of overtime in 2012, Plaintiff and Garton are similarly situated because Supervisor Avina did all the scheduling with the input of Manager Fox.

However, Plaintiff cannot rely on Garton as a comparator to show disparate treatment because the circumstances of Plaintiff's September 23, 2012 overtime and Garton's October 28, 2012 overtime were materially different. *See Coleman*, 667 F.3d at 846 (recognizing that the purportedly similarly situated employee must be "directly comparable to the plaintiff in all material respects"). The material difference in this instance is that Garton worked her regular shift before the scheduled overtime and Plaintiff did not.

The "Agreement" between the United States Postal Service and APWU for 2010-2015 (Handbook EL-912) provides, in relevant part, under the heading "Section 5. Overtime Assignments":

> C.   1.   a.   When during the quarter the need for overtime arises, employees with the necessary skills having listed their names will be selected in order of their seniority on a rotating basis.
>
> b.   Those absent or on leave shall be passed over.

(ECF 100, Ex. 21). Fox relied on this provision of the Agreement to instruct Avina to cancel Plaintiff's scheduled September 23, 2012 overtime. *See* (ECF 100, Ex. 23); (ECF 100, Ex. 19, p. 2); *see also* (ECF 100, Ex. 30). Plaintiff attempts to discredit this reason by noting that neither Avina

nor Fox referenced the manual section in September 2012 when cancelling his overtime; but, without more, the fact the Agreement was not referenced at that time does not mean it did not apply. Moreover, in his deposition, Plaintiff agreed that, if Garton had worked the day before her overtime, her situation would be different from his.

In his deposition, Plaintiff testified that both he and Garton called on a Thursday to report their absences, suggesting that their situations were materially similar. (ECF 100, Ex. 1, p. 91). While they both called on Thursday to report their absences, Garton called on Thursday to cancel her Thursday and Friday shifts, whereas Plaintiff called late Thursday evening to cancel his Friday and Saturday shifts. And, Garton worked Saturday before her scheduled Sunday overtime; Plaintiff did not.

Similarly, Plaintiff also attempts to show that he was treated differently from Garton by noting that neither Avina nor any other Gary P&DC personnel contacted Garton during Garton's leave or cancelled Garton's overtime, whereas he received a call and cancellation. *See* (ECF 112, p. 3, ¶ 11). However, this logic is circular. Garton did not receive a call or have her overtime cancelled because she worked the day before her overtime and, thus, was not "absent or on leave" before the overtime.

Finally, Plaintiff notes that, on January 6, 2013, Gary Area Local 266's Step 2 designee, Robert L. Hock III, issued a Correction and Additions GAL1245RH in relation to the cancelled September 23, 2013 overtime, which states: "Possible[sic] had management not shown feminist favoritism to a female employee by calling her and telling her that she could not work her off days as posted this might not be an issue." (ECF 112, p. 154– "Exhibit 4" to Pl. 12/19/2016 Decl.). The letter also opines that management treated Plaintiff inequitably in relation to Garton. *Id*. This letter was received by Gary P&DC on January 7, 2013. *Id*. Plaintiff attempts to use this letter to create a

genuine issue of material fact regarding Fox's alleged discriminatory intent. *See* (ECF 112, p. 4). It does not. First, the union official was not considering the legal standard of discrimination under Title VII. Second, there is no indication that the union official considered Section 8.5.C.1.B of the Agreement in his conclusions, and, as noted above, Plaintiff and Garton are not similarly situated because Garton worked the day before the overtime when Plaintiff did not. Third, the union official offers no facts in support of his conclusions. The analysis and motivation behind the Union's resolution of Plaintiff's grievance regarding the cancelled overtime, which resulted in Plaintiff being allowed to work eight hours of overtime, is distinct from the legal analysis under Title VII.

A reasonable juror could not conclude that Plaintiff was discriminated against based on his race or his gender in contrast with MPE mechanic Paula Garton in relation to the cancellation of Plaintiff's overtime on September 23, 2012, and the Court grants summary judgment in favor of Defendant on Counts I and II of Plaintiff's Complaint for race and sex discrimination.

2.    *Harassment and Hostile Work Environment*

In Count III of the Third Amended Complaint, Plaintiff alleges that the conduct of Lawanda Fox, Bernyce Thompson, and Karla Forte was motivated by the intent to harass him and create a hostile work environment by attempting to discredit and diminish the competency of Plaintiff's job performance and to create conditions and circumstances to increase the likelihood of him being wrongfully discharged. Plaintiff alleges that, as a result of this harassment, he suffered and continues to suffer anxiety attacks at work and had to submit to several counseling sessions.

Title VII's prohibition against discrimination based on race and sex includes harassment based on race or sex that creates a hostile work environment. *See Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 863 (7th Cir. 2005). To prevail on a claim of hostile work environment, a plaintiff must prove: (1) that the work environment was both subjectively and objectively offensive;

28

(2) that the harassment was based on plaintiff's sex and/or race; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability. *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016); *Vance v. Ball State Univ.*, 646 F.3d 461, 459 (7th Cir. 2011), *aff'd* 133 S. Ct. 2434 (2013).

The first question of whether the work environment was both subjectively and objectively offensive may be "subsumed by the question whether the harassment was severe or pervasive enough to rise to the level of a hostile work environment. In the end, the inquiry is the same." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 n. 6 (7th Cir. 2016). When considering whether alleged harassment is pervasive, the Seventh Circuit Court of Appeals looks to "all the surrounding circumstances, including the frequency of the harassing conduct, its severity, whether it was physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002).

"Although a connection between the harassment and the plaintiff's protected class need not be explicit, there must be *some* connection, for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Cole*, 838 F.3d at 896 (internal quotation marks omitted) (quoting *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014) (quoting *Beamon*, 411 F.3d at 863)). It is also true that "forms of harassment that might seem neutral in terms of sex or race can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status." *Id*.

Plaintiff argues that his claim of unlawful harassment and hostile workplace environment is based on the actions of Fox, Forte, and Thompson designed to subject Plaintiff to repeated

discriminatory and adverse action to punish him for engaging in protected activity by speaking out against and filing formal written complaints complaining of seemingly unlawful discriminatory practices in the workplace. Plaintiff relies on five events to attempt to show a hostile work environment based on race and sex: (1) the Christmas 2012 overtime schedule; (2) the changing of Plaintiff's work duties in August and September 2013; (3) the email about bi-weekly maintenance shown to Plaintiff by Thompson in January 2014; (4) the "deems desirable" list incident on October 10, 2014; (5) Thompson's request that Plaintiff repair the DBCS machine #14 on September 15, 2015; and (6) Plaintiff's request for three days of sick leave on January 6, 2016. As set forth below, Plaintiff has offered no evidence from which a reasonable juror could find that these incidents were either objectively offensive, severe or pervasive, or, more importantly, taken because of Plaintiff's sex or race. The Court considers each event in turn.

a.    Christmas 2012 overtime

Plaintiff contends that the fact that he was not scheduled for overtime on December 25, 2012 was an incident of harassment. Supervisor Avina was responsible for the regular and holiday schedules for all three Tours for MPE mechanics and ETs. Thompson was not responsible for the schedules. Plaintiff offers no evidence that Thompson was in any way involved with the 2012 holiday schedule, and he makes no argument that Supervisor Avina acted with any discriminatory animus toward Plaintiff.

Avina explained that he scheduled employees to work the 2012 Christmas holiday based on the mail processing equipment that would be running on each tour and the seniority of the employees and that the Manager of Distribution Operations decided that the first class mail processing equipment would not be in operation during the 2012 Christmas holiday on Tour I (10:00 p.m. on December 24, 2012, to 6:30 a.m. on December 25, 2012). Although Plaintiff avers that, prior

to December 15, 2012, Gary P&DC's Supervisor of Distribution Operations Monica Glines informed Plaintiff that she required a mechanic for the night of December 24, 2012, Plaintiff offers no evidence to contest that the *Manager* of Distribution Operations informed Avina that the first class mail processing equipment would not be in operation during Tour I on December 25, 2012.

No MPE mechanic was scheduled to work the Christmas 2012 holiday for Tour I. Although Plaintiff signed the list to work overtime, neither he nor any other MPE mechanic was assigned overtime based on the needs of the Postal Service. Plaintiff was disappointed not to be able to "swap" tours during the 2012 Christmas holiday as he had done in the past, but no employee is guaranteed the opportunity to "swap" shifts and there is no evidence that the schedule was made for any reason other than the needs of the Gary P&DC. There is nothing objectively offensive or severe about this incident; nor is there any evidence from which an inference can be drawn that the 2012 holiday schedule was made based on Plaintiff's race or sex.

b.    Plaintiff's work duties in August and September 2013

As set forth in more detail in the Material Facts section above, in August and September 2013, Thompson assigned Plaintiff to make repairs to the APBS route, which he was qualified to do. Thompson sometimes gave Plaintiff this assignment during the course of his shift, and, as a result, sometimes Plaintiff was unable to complete the task. If the APBS route was assigned without sufficient time for Plaintiff to complete the task, Plaintiff was not required to complete it. Plaintiff understood that a supervisor can change his duties throughout the shift and that the needs of the shift may change throughout the day. Although Plaintiff was not able to complete the APBS route and passed the route along to the next Tour on some dates, Plaintiff was never suspended or disciplined as a result.

On September 4, 2013, Plaintiff participated in an investigative interview conducted by Thompson, in the presence of Union Representative Benjamin Barnes, regarding Plaintiff not finishing daily maintenance duties on August 28, 2013. Plaintiff believes that the investigative interview was unwarranted. However, an investigative interview is an information-gathering tool, and Plaintiff was not disciplined nor did he suffer any further consequences from the September 4, 2013 investigative interview. The investigative interview was conducted within Thompson's supervisory discretion based on the circumstances.

Plaintiff also participated in an investigative interview on September 5, 2013, regarding his work on the APBS route on September 4, 2012. The investigative interview occurred not because Plaintiff did not finish the APBS route but rather because he did not log in the eCBM those tasks on the route that he had completed, which upset Supervisor Forte on Tour 2. Again, an investigative interview is not discipline, and Plaintiff was not disciplined following the investigative interview.

These incidents regarding completing maintenance tasks and participating in an investigative interview are not objectively offensive or severe, and there is no evidence from which to draw an inference that they occurred because of Plaintiff's race or sex.

c.    Email about bi-weekly maintenance

On or about January 22, 2014, Michael Hagler, the Manager of Transportation/Networks at the Gary P&DC, forwarded to Supervisor Thompson as well as to Supervisors Forte and Avina an email chain regarding missing mail pieces that were found on an APBS at another postal plant during a bi-monthly route. The email did not reference Plaintiff or anything that happened in Gary, Indiana. Thompson gave Plaintiff a printed copy of the email for informational purposes. Thompson did not give a copy of the email chain to any MPE mechanic other than Plaintiff because Plaintiff was the only MPE mechanic that Thompson supervised on Tour 1. Supervisors Forte and Avina

supervised Tours 2 and 3. Plaintiff was not issued any discipline regarding this email nor did his duties or assignments change. Although Plaintiff characterizes Thompson's presentation of the email to Plaintiff as a "stern warning," (ECF 100, Ex. 1, pp. 49-50), Thompson also said, "[W]e have to make sure that all the mail is accounted for," *id.* at p. 50. While Plaintiff believes that the email does not apply to his work because he is not assigned the duties and responsibilities to conduct the bi-monthly route task, which Thompson knew, it was within Thompson's supervisory discretion to share the email with him. (ECF 68, ¶ 34); (ECF 112, Ex. A, ¶ 35). There is nothing objectively offensive or severe about this event, and there is no evidence from which to draw an inference that Thompson showed Plaintiff the email to harass him based on his race or sex.

       d.      "Deems Desirable" list

The "deems desirable" list is a list of employees who call off work around a holiday. On or about October 10, 2014, Thompson told Plaintiff that he was on the "deems desirable" list. The list was never mentioned again, and Plaintiff was not disciplined. Despite Plaintiff's assertion that the use of the "deems desirable" list is improper, Plaintiff offers no evidence that Thompson's mention of this list affected his work, scheduling, eligibility for overtime, or his holiday schedule. There is nothing objectively offensive or severe about this incident, and Plaintiff offers no evidence that Thompson talked to him about the "deems desirable" list because of his race or sex.

       e.      September 15, 2015 request to repair the DBCS machine #14

On September 15, 2015, Thompson assigned Plaintiff to repair a broken belt on DBCS machine # 14. Plaintiff had fixed belts on other machines. However, Plaintiff did not attempt to complete the task because he is not trained to service any DBCS machines, which Thompson knew. ET Ben Barnes came to the machine and fixed the broken belt. Plaintiff did not watch Barnes repair the belt; Plaintiff did not touch the machine; and Thompson did not force Plaintiff to touch the

machine. In fact, Plaintiff states in his Declaration that, once he told Thompson he could not serve

the DBCS machine, Thompson radioed Barnes, who had the knowledge, skill, and training to service

DBCS machines. Plaintiff was not injured in relation to this event. However, Plaintiff completed a

Report of Hazard, Unsafe Condition or Practice form related to the request that he fix the belt on the

basis that Thompson directed him to commit an unsafe act in working on machinery outside his

training in contravention of the CBA. Plaintiff was not disciplined for not fixing the belt. At most,

this appears to be nothing more than an error on the part of Thompson in requesting Plaintiff to

make the repair, which was quickly remedied after Plaintiff's explanation, with no adverse

consequence to Plaintiff. There is nothing objectively harassing about this incident, and it is not

severe. Moreover, Plaintiff offers no evidence from which an inference could be drawn that the

improper request to have Plaintiff repair the DBCS #14 machine was made based on his race or sex.

      f.      January 6, 2016 request for three days of sick leave

Finally, Plaintiff contends that the events surrounding his request for three days of sick leave

on January 6, 2016, constitute harassment contributing to a hostile work environment. On January

6, 2016, at approximately 11:35 p.m., a belt broke on a Flat Sorter Machine, which Plaintiff is

qualified to repair. Thompson assigned Plaintiff to fix this belt at 11:40 p.m., informing him that he

only had one hour from midnight to 1:00 a.m. to fix the machine because Operations needed to run

the machine by 1:00 a.m. so that the mail could be sorted and processed for the mail carriers. At

12:40 a.m., Lead Clerk Michelle Westbrooks called Thompson to tell her that Plaintiff never arrived

to work on the machine. Thompson called Plaintiff on the radio for his location, and he said, "I'm

on break." Thompson asked him how he could be on break when Operations gave them an hour

window to replace the belt; Thompson received no response. Thompson then asked Plaintiff to

report to the office; again she received no response. Thompson called Plaintiff on the radio again

to ask him to report to the Flat Sorter Machine, and Plaintiff arrived at 12:50 a.m. After further conversation, Plaintiff told Thompson that he was going home because he was ill and requested three work days of sick leave. When he made the request, Plaintiff did not know if he was going to be sick for three days but he believed that he could take three days of sick leave without documentation.

Thompson told Plaintiff that he would need documentation for his sick time by January 8, 2016, and made a notation on Plaintiff's leave request slip, which Plaintiff saw before he left on January 6, 2016. The United States Postal Service's Employee and Labor Relations Manual ("ELM"), Chapter 5, Section 513.36 provides that medical documentation or other acceptable evidence of incapacity for work or need to care for a family member "is required . . . when the supervisor deems documentation desirable for the protection of the interests of the Postal Service." Plaintiff returned to work on January 11, 2016, after he recovered from his illness; he did not provide documentation until January 13, 2016.

On January 13, 2016, at 3:30 a.m., Thompson conducted an investigative interview with Plaintiff regarding his failure to follow instructions to fix the belt on January 6, 2016, and regarding not submitting the documentation by January 8, 2016. The investigative interview did not lead to any discipline being issued to Plaintiff. However, Thompson considered Plaintiff to have been absent without leave ("AWOL") during the three-day absence, and Plaintiff was not paid.

On January 27, 2016, Plaintiff filed a grievance with the Union. On January 27, 2016, Union Steward representative Phillip A. Radford spoke with Thompson "concerning the impropriety of placing USPS employee and APWU member [Plaintiff] on AWOL status on the 13th Day of January, 2016." Sometime after January 10, 2016, Union President Robert Hock spoke with Gary P&DC Maintenance Manager Rodney B. Lane to "make the necessary corrections for [Plaintiff]

being wrongfully deprived of pay for the time period January 6-10, 2016." Plaintiff was later paid for these dates.

Although these events were subjectively offensive to Plaintiff, were likely more than an annoyance, and are the most serious of those identified by Plaintiff, they are not objectively offensive because they are not severe enough to unreasonably interfere with an employee's work performance. Plaintiff underwent counseling, but he offers no evidence that his work performance was affected. More importantly, once again, there is no evidence from which an inference can be drawn that Thompson treated Plaintiff as AWOL because of his race or sex.

g.     All of the events in combination

Contrary to Plaintiff's general assertion that a reasonable juror could not infer that the management and supervisors had a legitimate non-discriminatory reason for their conduct, *see* (ECF 113 p. 10), the management and supervisors offered evidence of a legitimate nondiscriminatory reason for each of the alleged instances of harassment as set forth above. None of these events is objectively offensive because they were not physically threatening, were not openly racist or sexist, and did not unreasonably interfere with Plaintiff's performance. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). And, isolated incidents, unless "extremely serious," will not support a hostile work environment claim. *Ellis v. CCA of Tenn, LLC*, 650 F.3d 640, 648 (7th Cir. 2011) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)). These were six events over a four-year period; each of the events has a legitimate, nondiscriminatory reason that Plaintiff has not refuted.

Title VII "does not set forth 'a general civility code for the American workplace.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). "[N]ormally petty slights, minor annoyances, and

simple lack of good manners will not" deter victims of discrimination from complaining to the EEOC about their employers. *Id.*

Most importantly, Plaintiff has offered no evidence linking any of these events to his race or sex. Even if the events and participating in investigative interviews was stressful to Plaintiff, Defendant's conduct is not actionable because no reasonable juror could find that these events occurred because of Plaintiff's race or sex, as required for a claim of hostile work environment under Title VII.

A reasonable juror could not conclude that Plaintiff was subject to harassment or a hostile work environment as prohibited under Title VII, and the Court grants summary judgment in favor of Defendant on Count III of Plaintiff's Complaint.

3.      *Title VII Retaliation*

In Count IV of his Third Amended Complaint, Plaintiff alleges that Bernyce Thompson's conduct toward Plaintiff was motivated by retaliation for him engaging in protected activity in the form of filing and maintaining this Title VII action. Plaintiff alleges that he was subject to an adverse employment action in the form of being selectively singled out to be chastised in the form of a written memo relating to someone else's negligent conduct involving the APBS bi-monthly route mail search, having his name placed on the "deems desirable" list, being intentionally subject to a potentially hazardous and unsafe work condition, and being subjected to an unwarranted written reprimand. He further alleges that this all caused him mental anguish and emotional distress. In his Response in Opposition, Plaintiff argues that he was "maliciously subjected to repeated instance of adverse employment action linked with and connected to his having had engaged in protected speech in the form of filing formal written grievances of unlawful discriminatory and retaliatory practices

37

by Fox, Forte, and Thompson, seeking investigation by the Union as well as the United States Postal Services EEO."

Title VII prohibits retaliation against an employee engaged in statutorily protected activity, such as opposing unlawful employment practices or participating in the investigation of one. 42 U.S.C. § 2000e-3(a). A claim of retaliation requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove that he engaged in protected activity and suffered an adverse employment action and that there is a causal link between the two. *Lord v. High Voltage Software*, 839 F.3d 556, 563 (7th Cir. 2016); *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016); *Castro v. Devry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015). Plaintiff must prove that retaliatory animus was the but-for cause of the adverse employment action and not merely a motivating factor. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, — U.S. — ,—, 133 S. Ct. 2517, 2533 (2013).

In the context of a retaliation claim, an action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Boss*, 816 F.3d at 918 (citing *Burlington N.*, 548 U.S. at 68). "To rise to the level of an adverse action, a change 'must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.'" *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016) (quoting *Lewis v. City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007)). "An employee must suffer something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Boss*, 816 F.3d at 918-19 (quoting *Hobbs v. City of Chi.*, 573 F.3d 454, 463-64 (7th Cir. 2009)). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Poullard v. McDonald*, 829 F.3d 844, 857 (7th Cir. 2016) (quotation

marks omitted) (quoting *Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014)). For example, adverse

actions for purposes of a retaliation claim may include:

> (1) cases in which the employee's compensation, fringe benefits, or other financial
> terms of employment are diminished, including termination; (2) cases in which a
> nominally lateral transfer with no change in financial terms significantly reduces the
> employee's career prospects by preventing her from using her skills and experience,
> so that the skills are likely to atrophy and her career is likely to be stunted; and (3)
> cases in which the employee is not moved to a different job or the skill requirements
> of her present job altered, but the conditions in which she works are changed in a
> way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise
> significantly negative alteration in her workplace environment.

*Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1069 (7th Cir. 2012) (quoting *Nichols v. S. Ill. Univ.-*

*Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007)).

In this case, even if Plaintiff could establish a but-for causal connection between the filing

of his EEOC charge of discrimination and the subsequent events of alleged retaliation, Plaintiff has

identified no materially adverse employment action. As set forth in the Material Facts above,

Plaintiff was not disciplined from 2012 to 2016. Plaintiff offers evidence only of investigative

interviews. However, investigative interviews are not themselves discipline but rather are a form of

information gathering for supervisors to be used when determining whether to issue discipline. None

of Plaintiff's investigative interviews resulted in any discipline. And, even if the investigative

interviews could be viewed as unfair or the equivalent of a negative performance review, "[u]nfair

reprimands or negative performance reviews, unaccompanied by tangible job consequences, do not

suffice. . . ." *Boss*, 816 F.3d at 919 (citing *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir.

2010). The Supreme Court "has excluded from the bounds of materially adverse actions" "'petty

slights or minor annoyances that often taken place and that all employees experience.'" *Poullard*,

829 F.3d at 857 (quoting *Burlington Northern*, 548 U.S. at 68).

Similarly, certain conversations with Thompson identified by Plaintiff do not rise to the level of an adverse employment action. First, Thompson's conversation with Plaintiff regarding being on the "deems desired" list in October 2014 was an isolated occurrence and did not result in any discipline or change in the terms of Plaintiff's employment.

Second, Plaintiff argues that Thompson assigning him to fix a belt on DBCS machine #14 was retaliatory because he did not have the requisite training to repair that machine, which Thompson knew. However, once it became clear to Thompson that Plaintiff was not qualified to repair that machine, a different employee was assigned to repair the machine; Plaintiff was not disciplined nor did he suffer any tangible job consequence. Plaintiff was not actually in any danger, and he was not harmed. Also, Plaintiff asserts that this incident, which occurred on September 15, 2015, was "committed within a relatively close time period after the November 20, 2014 scheduled hearing on the EEO Charge of Discrimination. (ECF 112, pp. 8-9, ¶ 30). The ten months that passed between the scheduled EEOC hearing and September 15, 2015 request to fix DBCS machine #14 do not make the events "relatively close;" these events are too far apart in time to be causally related under all the circumstances of this case. *See, e.g.*, *Porter v. City of Chicago*, 700 F.3d 944, 957-58 (7th Cir. 2012) (holding that a time span of nearly one year between protected activity and the adverse employment action "does not suffice to show a causal connection") (collecting cases); *Rao v. Gondi*, 14 C 66, 2017 WL 2445131, at *22 (N.D. Ill. June 5, 2017) (finding that the "significant time gap between the alleged protected activity in the fall of 2012 and the alleged adverse actions in March 2013 and the research integrity decision in 2014, 'substantially' weakens [the plaintiff's] retaliation claim"); *Glass v. Revere Plastics Sys.*, No. 4:14-CV-81, 2017 WL 2403191, at *11 (S.D. Ind. June 2, 2017) (finding that the time between the protective activity in September 2013 and the

discharge almost a year later in October 2014 "defeats any possible inference of retaliatory causation").

Third, in January 2014, Thompson showed Plaintiff the email regarding missing mail pieces on an APBS machine at another plant. The email did not reference Plaintiff or the Gary P&DC, and Plaintiff was not disciplined in relation to the mail. Although Plaintiff felt singled out, Plaintiff was the only MPE mechanic that Thompson supervised and, thus, did not show the email to anyone else. Notably, the email was sent not only to Thompson (Tour I Supervisor), but also to the Supervisors of Tours 2 and 3—Forte and Avina, who would presumably show the email to the MPE mechanics they supervised if they deemed it appropriate.

Finally, Plaintiff points to the events surrounding his January 6, 2016 request for three days sick leave. Thompson found Plaintiff to have been AWOL for the three days he was absent because he did not provide medical documentation by January 8, 2016, as she initially required. The request for medical documentation by a supervisor was allowed by Postal Service policy, and the AWOL determination was eventually reversed and Plaintiff received his pay for those days.

As set forth in the previous section, each event cited by Plaintiff as a form of retaliation occurred for a legitimate business reason. And Plaintiff has offered no evidence that any of these reasons was pretextual or retaliatory. Because a reasonable juror could not conclude that Plaintiff was retaliated against for engaging in protected activity, the Court grants summary judgment in favor of Defendant on Count IV of the Third Amended Complaint.

**CONCLUSION**

Based on the foregoing, the Court hereby **DENIES** Defendant's Motion to Strike [DE 114];

**DENIES** Plaintiff's Motion Requesting Leave to File Sur Reply to Defendant's Reply [DE 119];

and **GRANTS** Defendant's Motion for Summary Judgment [DE 98].

The Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Defendant

Megan J. Brennan Postmaster General and against Plaintiff David R. Dyson.

So ORDERED this 14th day of July, 2017.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:    Pro se Plaintiff

42